## The Ilion Bank *vs.* Carver and others.

On the 5th of January, 1855, C., a director in the Ilion Bank, pretended to sell to P., a person of little or no pecuniary responsibility, his stock therein, of the par value of $15,000, for the sum of $17,250. P., with the connivance of C. and the cashier, who was the son of C., immediately pledged the same to the bank as security for the payment of his note at ninety days, executed to the bank at the same time, for the sum of $17,250, and received from the bank the latter sum in the bills of the bank. This was charged to have been done in pursuance of a conspiracy between the three to injure and cripple the bank in its business, and to enable C. to impose his stock upon the bank at a price much greater than it was really worth ; and in consequence of these proceedings the bank was greatly embarrassed in its business, and C. did receive for his stock a sum far beyond its actual value. *Held,* that whether the transaction was treated as a willful violation of the duty which C. and his son, the cashier, owed to the bank, growing out of their official relations to it, or as a direct conspiracy to cripple and defraud the bank, the parties concerned in it were liable to the bank for the damages which it had sustained thereby.

*Held also,* that in an action by the bank directly against them, for damages, no laches on the part of the plaintiff, short of the statute of limitations, would constitute a defense.

*Held further,* that this was an executed contract, and that although the plaintiff might have been guilty of laches, and so lost its right to repudiate the transaction, yet that upon a complaint sufficiently broad to cover a claim for *damages,* it might maintain an action upon that ground, at any time allowed by the statute of limitations.

APPEAL from a judgment entered at a special term, by which the plaintiff was nonsuited, and the complaint dismissed. The following are the allegations in the complaint: In the early part of 1852, the plaintiffs were incorporated under the general banking act, and in August of that year commenced, and thence carried on the business of banking at the village of Ilion. The articles of association provided that the bank should be managed by eleven directors, who were to be elected annually, and who should be stockholders. That Benjamin Carver was one of the directors of the institution, and B. F. Carver its cashier, whereby it became and was the duty of the one as director, and the other as cashier, faithfully to discharge the duties and obligations of their respective

offices, and faithfully and for the best interest of the bank, and pursuant to the laws of the state and the by-laws of the bank, to administer and use its funds, and to obey all lawful rules, regulations and by-laws of the bank. That at a meeting of the board of directors in July, 1852, a resolution was passed in the following words: " Resolved, that the Ilion Bank will not discount any note without two indorsers ;" which resolution thereafter remained in force, forbidding the discount of the paper thereinafter mentioned. That the defendants had notice of this resolution. That in January, 1855, there was dissatisfaction among the stockholders and directors of the bank, at the course theretofore pursued by the Carvers, in the discharge of their duties as director and cashier ; and a party among the stockholders was forming to oust the elder Carver from his place as director, at the ensuing election in February, and elect a board of directors which should remove Benjamin F. from the office of cashier, if the new board should deem that proper ; all of which was accomplished by Benjamin Carver ceasing to be a stockholder, and the resignation of Benjamin F. That Benjamin Carver held and owned 150 shares of the capital stock of the bank, until he disposed of it as thereinafter stated, of the par value of $100 per share. That on the 5th of January, 1855, the two Carvers fraudulently combined with Prescott to accomplish the wrongful and fraudulent purposes thereinafter stated ; and thereupon the three defendants, contriving and intending to defraud and injure the plaintiffs, and to sell the said stock of Benjamin Carver to, and impose the same upon the plaintiff, at a great premium, and at a price above its then value, and to convert to the use of one of them the money of the bank, the said Benjamin and Benjamin F., not regarding but violating their duty as such officers, and abusing the several trusts reposed in them, conceived and carried out a fraudulent and wrongful scheme, to accomplish such end and purpose ; in pursuance whereof, on the 5th of January, 1855, Prescott bought from and Carver sold to him, his stock in the bank, at a price to

the plaintiffs unknown; and thereupon, as a transfer of the same, said Benjamin Carver indorsed his name on the scrip and delivered it to Prescott.   That on the same day, or within a few days thereafter, Prescott attached the scrip for the stock to an instrument executed by him, in the words and figures following, to wit:

"307.65 Interest.

$17,250.                    *Mohawk, January 5th*, 1855.

Ninety days from date, I promise to pay Eliphalet Remington, as president of the Ilion Bank, at the banking house of said bank, in the village of Ilion, for value rec'd, seventeen thousand two hundred and fifty dollars, with interest at the rate of seven per cent per annum, having deposited with and pledged to said president, as collateral security, one hundred and fifty shares of the capital stock of the said Ilion Bank, with authority to sell the same on condition this note is not paid at maturity; provided that the said one hundred and fifty shares of stock shall not be sold for less than the amount of this note and the interest which may have accrued thereon; and provided, also, that the said bank as aforesaid shall have recourse to the said stock hereby pledged only and solely for the payment of this note.   (Signed)   AMOS H. PRESCOTT."

That he delivered the same to B. F. Carver as cashier of the plaintiff; "who thereupon, as such cashier, and assuming to act for the plaintiffs in said transaction, without any indorser or surety, and without any other or further instrument or security for the repayment of the funds and money so advanced or delivered to Prescott, as hereinafter mentioned, pretended to discount the said instrument, and did thereupon pay, deliver and furnish, upon such instrument, to the said Prescott, or to some other person for the use of one of the defendants, the sum of $17,250 of the moneys and funds of the bank, or did credit said Prescott upon the books of the bank with said sum of $17,250 as deposited by him on that day, without the same having been deposited by him, except as aforesaid; and the said Prescott thereupon, either personally

or by or through the medium of some other person, did pay to the said Benjamin Carver, in money or otherwise, the said sum of $17,250, so received by him, the said Prescott as aforesaid." That the market value of the plaintiffs' stock, and the price for which it could have been fairly sold at the time of said transaction, and at the expiration of ninety days, was a much less sum than the amount at which it was so pledged to the plaintiffs. That *immediately* upon the transaction coming to the knowledge of the board of directors, and on the 1st of February, 1855, the said board passed resolutions, which are set out. That the transaction referred to in the resolutions is the same complained of; and that before the resolutions were passed, B. F. Carver had ceased to be cashier. That *shortly after and on or about* the 6th of April ensuing, copies of these resolutions, with a notice annexed, were delivered to the defendants respectively. That on the 14th of April, the money advanced upon the security remaining unpaid, the plaintiffs gave notice that the stock would be sold at auction on the 30th of April; at which time the plaintiffs did sell the same at auction to the highest bidder, for the sum of $15,195, which fell short of the amount payable by the terms of the instrument, $2362.65; and that this sum remains unpaid. The residue of the complaint consisted of allegations of special damages, &c. sustained by the plaintiffs; concluding with a demand for judgment for $20,000.

The answer of the defendants B. Carver and Prescott severally denied the material allegations of the complaint. They alleged that Carver sold his stock to Prescott at its fair value, and that the latter, without the aid, privity or knowledge of the former, applied for and obtained the discount; and that B. F. Carver had authority to make it. They further alleged that the board of directors had notice and knowledge of the transaction on the 8th of January, and that they ratified and confirmed it.

*P. Gridley,* for the appellant.

*F. Kernan* and *C. H. Doolittle,* for the defendants.

*By the Court*, PRATT, J. The complaint in this case charges that on the 5th day of January, 1855, Benjamin Carver, a director in the bank, pretended to sell to the defendant Amos H. Prescott, a person of little or no pecuniary responsibility, his stock therein, of the par value of $15,000, for the sum of $17,250; that Prescott, with the connivance of said Carver and the cashier, Benjamin F. Carver, immediately pledged the same to the bank, executing to it the instrument set out in the complaint, and received therefrom the sum of $17,250 in the bills of the bank. This is charged to have deen done in accordance with a conspiracy between the three to injure and cripple the bank in its business, and to enable Carver to impose his stock upon the bank at a price much greater than it was really worth; and that in consequence of these proceedings the bank was greatly crippled and injured in its business, and Carver did receive for his stock a sum much greater than its actual value. The evidence upon the trial tended to establish these allegations of the complaint. It was also proved that the transaction came to the knowledge of the other officers of the bank on the 8th day of January, at which time resolutions were passed to make a loan, and a committee was appointed to investigate the condition of the bank. On the same day Carver, the cashier, resigned. On the 13th another meeting was held, at which vacancies in the direction, occasioned by the sale of their stock by Carver and other directors, were filled and measures were taken for strengthening the condition of the bank. On the 1st of February resolutions were passed repudiating the whole transaction, and authorizing the attorney of the bank to tender back to Carver the stock and demand the amount of money received. A copy of the resolutions was not served upon the defendants until the 8th day of April. The defendants refusing to comply, the stock was sold at auction on the 30th of April, after due notice. This action was then brought, and the plaintiff was nonsuited at the circuit, on the ground that it had not been sufficiently prompt in repudiating the transaction.

That there has been a very gross fraud perpetrated upon the plaintiff is, upon the case as developed at the circuit, beyond question, and the inquiry now is, has the bank by its laches precluded itself from redress ?

An action on the case, if we may be allowed to use old terms, would generally lie in all cases where a wrong had been done to a person, from which he had suffered actual pecuniary loss. This principle is so elementary that it cannot be necessary to cite examples. It would therefore lie in all cases where a party had sustained loss in consequence of any fraud perpetrated upon him by the defendant, or of any willful violation of duty on the part of the defendant towards him, growing out of any relation between them, official or otherwise. (*Broom's Com.* 658.)

In the case at bar, whether the transaction be treated as a willful violation of the duty which the two Carvers owed to the bank, growing out of their official relation to it, or whether it be treated as a direct conspiracy to cripple and defraud the bank, it would seem that upon the most obvious principles of elementary law, the defendants should be held liable for the damages which the bank has sustained thereby. And in an action against them directly, for damages, I know of no laches on the part of the plaintiff, short of the statute of limitations, which would constitute a defense. The error in the ruling at the circuit, if any was made, arose from not recognizing the distinction between the remedies which the law gives to the party defrauded, against the wrongdoer. Fraud, it is said, vitiates all contracts, and renders them not absolutely void, but voidable in the election of the party upon whom the fraud has been perpetrated. He therefore has two remedies. 1st. He may repudiate the transaction, and by restoring or offering to restore what he has received, call upon the tort feasor to restore also, and upon his refusal, may bring his action either in replevin or other form appropriate to effect such restoration. Thus in the sale of a horse, if the vendor is guilty of any fraud or deceit in regard to the condition or quality of

the animal, the purchaser may return or offer to return the property and bring his action for the consideration paid. And if the party elects to resort to this remedy, he must do so in a reasonable time after he ascertains the fraud. But the party defrauded is not bound to repudiate the transaction. He has his election, and may treat it as valid, and bring his action to recover the loss he has sustained in consequence of the fraud practiced upon him. And this remedy he may resort to at any time allowed by the statute of limitations. The sale of the horse presents a familiar example. If the vendor has defrauded the purchaser upon such sale in knowingly misrepresenting the condition or equality of the horse, instead of repudiating the sale the sale the latter may retain the horse and bring his action for the damages which he has sustained. These principles apply to executed contracts only. The cases of executory contracts are governed by different principles. In these cases, although the party has been fraudulently induced to enter into the contract, if, after a knowledge of the fraud that has been perpetrated against him, he goes on and performs the contract on his part he will be deemed to waive all objections which he might have made on account of such fraud. The law will presume that he is perfectly satisfied with the contract, notwithstanding he may have been deceived in some particulars. In such case, after having performed without objection, he can neither repudiate nor sustain an action for damages. For example, take again a contract for the sale of a horse to be paid for and delivered at a future time. If, after ascertaining that the vendor has fraudulently misrepresented the condition or qualities of the horse the purchaser shall accept the delivery of him, he would be bound to pay the stipulated price, and could sustain no action for damages. The law would be very defective if it were otherwise. The purchaser had it in his power, by refusing to accept the horse, to protect himself amply against any loss. By going on and executing the contract, therefore, he would be deemed to be satisfied with the horse at the price, notwithstanding the de-

fects which were unknown to him at the time of entering into the contract.

Returning to the case under consideration, and assuming that by failing to give notice of the resolutions of February 1st until April, the bank lost the right of repudiating the transaction *in toto*, did it lose all remedy for the loss it sustained from the fraudulent conduct of the defendants ? The complaint is broad enough to cover a claim for damages, and in fact that is obviously the scope of the action. Unless, therefore, this is one of those executory transactions or contracts above referred to, the right of action cannot be affected by any imputed laches on the part of the bank. Neither the unjust steward nor the fraudulent conspirator, if this was an executed contract, can insist that his victim shall act instantly, or forfeit for ever all remedy against him. The law has no such tender regard for the rights and interests of the bold offenders whose frauds and defalcations have of late so frequently startled and shocked the moral sense of the community. The statute of limitations in process of time will come to the aid of the worst offenders, as against a civil action, but that is not invoked in this case.

Was this then an executed contract within the principles laid down ? It seems to me to be manifestly so. The sale of the stock was complete ; the discount of that nondescript instrument was complete, and the pocketing of the exorbitant price for the stock by the senior Carver was complete. In fine, there was nothing more to be done to consummate the transaction as concocted between the parties. When it came to the knowledge of the other officers of the bank, the thing was accomplished. Carver had received his $17,250, the bank had the stock upon its hands, and Prescott, who had been from the beginning the mere instrument for working these nefarious purposes, had performed his mission and was left as he began, with neither liability nor responsibility resting upon him. There was therefore nothing to be done, so far as the guilty actors were concerned, for perfecting the entire object of the conspiracy.

It is true the entire loss which the bank was to suffer had not been ascertained. The time for the payment of the instrument was executory, but that would not alter the rights of the parties, or make the transaction executory. If a note be given on the sale of a horse, payable at a future day, that does not render the contract of sale executory. The purchaser, if defrauded, might undoubtedly sustain an action, even before the note should become due. Or, to take a case more directly in point: suppose a note should be discounted by a bank upon a fraudulent representation as to the responsibility of the parties to it. Upon discovering the fraud, the bank would undoubtedly have its election to repudiate the transaction at once, and bring an action against the wrongdoer for the money advanced; or it might wait until the note became due, make an effort to collect it, and then bring an action for the fraud, alleging as damages the amount unpaid.

Upon the whole, I think the nonsuit was improperly granted, and the judgment should be reversed and a new trial granted

[OSWEGO GENERAL TERM, July 7, 1857. *Hubbard, Pratt, Bacon* and *W. F. Allen,* Justices.]